UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/12/2021

JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

| | | |
|---|---|---|
| JENNIFER BILLS, on behalf of A.B.; | ) | |
| KAREN ALTOBELLO, on behalf of T.A.; | ) | |
| JOHN TIGNOR, on behalf of W.T.; | ) | |
| DIANA DUPLANTIER, on behalf of A.D.;  and | ) | |
| JOLEEN BOOTH, on behalf of J.T.; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  6:21CV00051 |
| | ) | |
| | ) | |
| VIRGINIA DEPARTMENT OF EDUCATION; | ) | Complaint |
| CHESTERFIELD COUNTY PUBLIC SCHOOLS; | ) | |
| CHESAPEAKE PUBLIC SCHOOLS; | ) | |
| VIRGINIA BEACH CITY PUBLIC SCHOOLS; | ) | |
| ALEXANDRIA CITY PUBLIC SCHOOLS; | ) | |
| LOUDOUN COUNTY PUBLIC SCHOOLS, | ) | |
| AMHERST COUNTY PUBLIC SCHOOLS, | ) | |
| JAMES F. LANE, in his official capacity, | ) | |
| DR. GREGORY C. HUTCHINGS, JR., in his official capacity, | ) | |
| MERVIN B. DAUGHERTY, ED. D., in his official capacity, | ) | |
| DR. JARED COTTON, in his official capacity, | ) | |
| DR. SCOTT A. ZIEGLER, in his official capacity, | ) | |
| DR. AARON C. SPENCE, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PROPOSED CLASS ACTION COMPLAINT AND REQUEST FOR AUTOMATIC AND PRELIMINARY INJUNCTION**

Plaintiffs, Jennifer Bills, Karen Altobello, John Tignor, Diana Duplantier and Joleen Booth, individually and on behalf of their special needs children (collectively referred to as "Plaintiffs"), for their Proposed Class Action Complaint and Request for Automatic Injunction and Preliminary Injunction against the Virginia Department of Education ("VDOE"), Chesterfield County Public Schools, Chesapeake Public Schools, Virginia Beach City Public Schools, Alexandria City Public Schools, Loudoun County Public Schools, Amherst County Public Schools

("School Districts"), and other similarly situated local educational agencies ("LEAs") in Virginia, and individual defendants James F. Lane, Dr. Gregory C. Hutchings, Jr., Mervin B. Daugherty, Ed. D., Dr. Jared Cotton, Dr. Scott A. Ziegler, and Dr. Aaron C. Spence ("individual defendants"), allege as follows:

PRELIMINARY STATEMENT

This action is brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, *et seq* ("IDEA"), the Regulations Governing Special Education Programs for Students with Disabilities in Virginia, 8 VAC §§ 20-81-10 *et seq*. ("Regulations"), Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; 28 C.F.R. §§ 35.104, the Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3900-03 ("The Virginia Act")*,*  the Virginians with Disabilities Act ("VDA"), Va. Code Ann. § 51.5-1, Article VIII of the Virginia Constitution, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, the Racketeer Influenced and Corrupt Organizations ("RICO") Act of 1970, 28 U.S.C. §§ 1961-1968 and the concomitant implementing regulations, case law and public policy.

Plaintiffs are children with disabilities and the parents of those children, who were denied their rights under IDEA, the Virginia Regulations, the ADA, § 504, the Virginia Act, the VDA, § 1983 and the Equal Protection Clause of the Fourteenth Amendment, and RICO for the 2019-2020 and 2020-2021 school years by defendants.  Plaintiffs seek declaratory and injunctive relief to enjoin defendants from violating their procedural and substantive rights under IDEA, the Regulations, the ADA, § 504, the Virginia Act, the VDA, § 1983 and the Equal Protection Clause of the Fourteenth Amendment and RICO.

JURISDICTION AND VENUE

1.      Jurisdiction of the United States District Court for the Western District of Virginia is invoked under 20 U.S.C. § 1415(i)(2) providing for jurisdiction and a right of action in this Court for parties aggrieved under IDEA.

2.      Jurisdiction of the United States District Court for the Western District of Virginia is also invoked under Section 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a), and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; 28 C.F.R. § 35.104.

3.      Jurisdiction is also invoked under 42 U.S.C. §1983.

4.      Jurisdiction is also invoked under the Racketeer Influenced and Corrupt Organizations Act of 1970 pursuant to 28 U.S.C. §§ 1961-1968 of RICO, in particular18 U.S.C. § 1964.

5.      Jurisdiction is also conferred by 28 U.S.C. § 1331, providing for jurisdiction of all civil actions arising under the laws of the United States.

6.      This Court may also order declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      The Court also has pendent jurisdiction to adjudicate any state claims, which may arise out of the same facts as the federal claims asserted herein pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the United States District Court for the Western District of Virginia, as authorized by 28 U.S.C. § 1391.

9.      Plaintiffs have not exhausted their administrative remedies under 20 U.S.C. § 1415(i)(2) because they fall within the exceptions to 20 U.S.C. §1415(i)(2), including 20 U.S.C. §

1415(j).

## THE PARTIES

10.     Plaintiff A.B. was fifteen years old in March of 2020 when Chesterfield County Public Schools ("CCPS") closed due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years. Exhibit 1, 03/26/20 A.B. IEP.

11.     Plaintiff Jennifer Bills is the parent and natural guardian of A.B. *Id.*

12.     Plaintiff T.A. was twenty years old in March of 2020 when Chesapeake Public Schools ("CPS") closed due to the COVID-19 pandemic, and eligible for special education under IDEA. Exhibit 2, 02/25/19 T.A. IEP Amendment.

13.     On May 13, 2020, Plaintiff T.A. moved to the Loudoun County Public Schools ("LCPS") and remained eligible for special education under IDEA.

14.     Plaintiff Karen Altobello is the parent and natural guardian of T.A. *Id.*

15.     Plaintiff W.T. was ten years old in March of 2020 when Virginia Beach City Public Schools ("VBCPS") closed due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years. Exhibit 3, 01/08/20 W.T. IEP.

16.     Plaintiff John Tignor is the parent and natural guardian of W.T. *Id.*

17.     Plaintiff A.D. was eleven years old in March of 2020 when Alexandria City Public Schools ("ACPS") closed due to the COVID-19 pandemic, and therefore a minor during the 2019-2020 and 2020-2021 school years. Exhibit 4, 04/25/19 A.D. IEP and 05/13/20 A.D. IEP.

18.     Plaintiff Diana Duplantier is the parent and natural guardian of A.D. *Id.*

19.     Plaintiff J.T. was twelve years old in March of 2020 when Virginia Beach City Public Schools ("VBCPS") closed due to the COVID-19 pandemic, and therefore a minor during

the 2019-2020 and 2020-2021 school years. Exhibit 5, 05/01/20 J.T. IEP.

20.    In August 2020, plaintiff J.T. moved to the Amherst County Public Schools ("APS") and remained eligible for special education under IDEA.

21.    Plaintiff Joleen Booth is the parent and natural guardian of J.T.  *Id.*

22.    Student plaintiffs are children with disabilities, as defined by 20 U.S.C. § 1401(3), and are entitled to receive a free and appropriate public education ("FAPE") and related services from defendants.  Exhibits 1-6.

23.    At all relevant times plaintiffs resided and continue to reside in their school districts.  *Id.*

24.    Student plaintiffs are not expressly named within this complaint because of privacy provisions in IDEA as well as the Family Education Rights Privacy Act ("FERPA"), 20 U.S.C. §1232.

25.    Defendant Virginia Department of Education ("VDOE") is, and was at all material times, a state educational agency ("SEA") that manages and controls the educational affairs of Virginia public schools.

26.    Defendant CCPS is a local education authority ("LEA") as defined by 14 U.S.C. §1401 and 34 C.F.R. § 300.28 responsible for providing A.B. with a FAPE.

27.    Defendant CPS is also a LEA as defined by 14 U.S.C. §1401 and 34 C.F.R. § 300.28 responsible for providing T.A. with a FAPE.

28.    Defendant LCPS is also a LEA as defined by 14 U.S.C. § 1401 and 34 C.F.R. § 300.28 responsible for providing T.A. with a FAPE.

29.    Defendant VBCPS is also a LEA as defined by 14 U.S.C. § 1401 and 34 C.F.R. § 300.28 responsible for providing W.T. and J.T. with a FAPE.

30.     Defendant ACPS is also a LEA as defined by 14 U.S.C. § 1401 and 34 C.F.R. § 300.28 responsible for providing A.D. with a FAPE.

31.     Defendant APS is also a LEA as defined by 14 U.S.C. § 1401 and 34 C.F.R. § 300.28 responsible for providing J.T. with a FAPE.

32.     The State of Virginia and the VDOE have established policies and procedures, both written and informal, concerning the implementation of IDEA.

33.     The VDOE receives funding pursuant to IDEA, 20 U.S.C. § 1412, the ADA, and § 504, and therefore must comply with the statutes' provisions.

34.     Defendant VDOE's principal place of business is Richmond, Virginia.

35.     Defendant CCPS's primary place of business is Chesterfield County, Virginia.

36.     Defendant CPS's primary place of business is Chesapeake, Virginia.

37.     Defendant VBCPS's primary place of business is Virginia Beach, Virginia.

38.     Defendant ACPS's primary place of business is Alexandria, Virginia.

39.     Defendant APS's primary place of business is Amherst, Virginia.

40.     Plaintiffs reside in the state of Virginia.

41.     Plaintiff A.B. resides in defendant CCPS's school district. Exhibit 1.

42.     Plaintiff T.A. resided in defendant CPS's school district from March to May of 2020. Exhibit 2.

43.     Plaintiff T.A. resides in defendant LCPS's school district as of May 13, 2020.

44.     Plaintiffs W.T.  resides in defendant VBCPS's school district. Exhibits 3.

45.     Plaintiff A.D. resided in defendant ACPS's school district until the end of March 2021. Exhibit 4.

46.     Plaintiff J.T.  resided in defendant VBCPS's school district at all times prior to

August 2020 relevant to this complaint. See Exhibit 5.

47.    Plaintiff J.T. resides in defendant APS's school district at all times from August 2020 onward relevant to this complaint. See Exhibit 6.

48.    The VDOE is responsible for ensuring all LEAs, including SCHOOL DISTRICTS, provide a FAPE to all Virginia students with disabilities pursuant to statutory rights arising under IDEA, the Regulations, the ADA, § 504, the Virginia Act, the VDA, Article VIII of the Virginia Constitution, and § 1983 and their implementing regulations.

49.    Defendant James F. Lane is the Virginia State Superintendent.

50.    Dr. Gregory C. Hutchings, Jr., is Superintendent of Alexandria City Public School District.

51.    Defendant Mervin B. Daugherty, Ed. D., is Superintendent of Chesterfield County Public School District.

52.    Dr. Jared Cotton is Superintendent of Chesapeake City Public School District.

53.    Defendant Scott A. Ziegler is Superintendent of Loudoun County Public Schools.

54.    Defendant Dr. Aaron C. Spence is the Superintendent of Virginia Beach Public Schools.

## FACTUAL ALLEGATIONS

55.    Plaintiffs bring this action under IDEA, the Virginia Regulations, the ADA, § 504, the Virginia Act, the VDA, § 1983 and the Equal Protection Clause of the Fourteenth Amendment, and RICO seeking declaratory and injunctive relief to enjoin the VDOE and Defendant School Districts, and other similarly situated LEAs, from violating their procedural and substantive rights

under IDEA, the Virginia Regulations, the ADA, § 504, the Virginia Act, the VDA, and § 1983.

56.     The primary mechanism for insuring implementation of IDEA's mandate of a FAPE is the Individualized Education Plan ("IEP"), as defined by 20 U.S.C. §§1401 (14), 1414(d).

57.     An IEP is a written statement, prepared for every child with a disability, that sets forth the special education and related services, supplementary aids and services, and program modifications or supports to be provided to the child, or on behalf of the child, to enable that child to achieve a comprehensive set of annual goals and short-term objectives.

58.     On March 23, 2020, Virginia closed its schools and ceased all in-person instruction and services due to the COVID-19 pandemic.

59.     In response to the COVD-19 pandemic, the United States Department of Education ("U.S. DOE") published two guidance documents to school districts in March of 2020:   a Supplemental Fact sheet and a Questions and Answers document.  Exhibit 7, March 12, 2020 Supplemental Fact Sheet; Exhibit 8, March 2020 Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak.

60.     The Fact Sheet stated: "To be clear:  ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section § 504), and Title II of the Americans with Disabilities Act should not prevent any school from offering educational programs through distance instruction."  Exhibit 7.

61.     The Questions and Answers sheet stated that each school would have to "make an individualized determination whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost."  Exhibit 8.

62.     The U.S. DOE did not provide any waivers of IDEA to any state.  Exhibits 7 and

8.

63.     On March 23, 2020, Virginia Governor Ralph Northam issued Executive Order 51, banning gatherings of more than ten people and closing all K-12 schools in Virginia for the remainder of the academic year.  Executive Order 51 contained no exceptions for students with disabilities whose educational placement pursuant to IDEA was in-person. Executive Order 51 went into effect at 11:59PM on March 24, 2020 and remained in effect until 11:59PM on April 24, 2020.  Exhibit 9, Executive Order 51.

64.     Governor Northam issued Executive Order 61 on May 8, 2020, ordering K-12 schools to remain closed for the remainder of the academic year. Executive Order 61 contained no exceptions for students with disabilities whose educational placement pursuant to IDEA was in-person. Exhibit 10, Executive Order 61.

65.     Governor Northam issued Guidance for Phased Reopening of Pre-K-12 Schools on June 9, 2020, which stated that all "PreK-12 schools in Virginia will be required to deliver new instruction to students for the 2020-2021 academic year, regardless of the operational status of school buildings," participation in instruction is expected to be compulsory for all students, whether through the provision of in-person or virtual services," and gave school districts the option of ignoring student's IEPs when said IEPs required in-person placements.  Exhibit 11, Phased Reopening Document.

66.     Prior to receiving any IDEA Part B funds, SEAs are required to make certain assurances to the U.S. D.O.E. regarding the SEA's compliance with IDEA.

67.     On July 26, 2019, Dr. James F. Lane, Superintendent for the VDOE, issued Memo #177-19, that shows that VDOE received almost $300 million in IDEA Part B funds from the U.S. DOE for FFY 2019.  Exhibit 12, July 26, 2019 Superintendent's Memo # 177-19.

68.     Attachment A to the memo also shows that ACPS received $3,418,247.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

69.     Attachment A also shows that CCPS received $12,094,729.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

70.     Attachment A also shows that CPS received $8,476,939.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

71.     Attachment A also shows that LCPS received $11,868,637.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id.*

72.     Attachment A also shows that VBCPS received $14,768,570.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id.*

73.     On July 1, 2020, James F. Lane, Ed.D., Superintendent of Public Instruction for Virginia, received a letter from U.S. DOE stating that U.S. DOE approved Virginia's application for Federal Fiscal Year ("FFY") 2020 funds under Part B of IDEA. Exhibit 13, July 1, 2020 Letter from U.S. DOE to Superintendent James Lane. The letter also notes that Virginia had provided a certification that its application met the requirements of IDEA Part B and that Virginia would operate its Part B program in accordance with all of the required assurances and certifications. *Id*.

74.     On July 17, 2020, James F. Lane, Ed.D., Superintendent of Public Instruction for Virginia, sent all Division Superintendents a memo that provided notice of "Part B Sections 611 and 619 Subgrant Awards for Special Education." Exhibit 14, Superintendent's Memo #182-20.

75.     The memo shows that VDOE received over $308 million from the U.S. DOE in IDEA Part B funds. *Id*.

76.     Attachment A to the memo also shows that ACPS received $3,581,726 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id*.

77.     Attachment A also shows that CCPS received $12,591,672 in "Flowthrough" IDEA funds for the 2020-2021 school year.  *Id*.

78.     Attachment A also shows that CPS received $8,728,550 "Flowthrough" IDEA dollars for the 2020-2021 school year.  *Id*.

79.     Attachment A also shows that LCPS received $12,589,312.00 in "Flowthrough IDEA funds for the 2020-2021 school year. *Id.*

80.     Attachment A also shows that VBCPS received 15,105,911.00 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id.*

81.     On July 23, 2021, James F. Lane, Ed.D., Superintendent of Public Instruction for Virginia, sent all Division Superintendents a memo that provided notice of "Part B Sections 611 and 619 Subgrant Awards for Special Education." Exhibit 15, Superintendent's Memo #198-21 with Attachment A.

82.     Exhibit 15 shows that Virginia was awarded over $312,000,000.00 in IDEA Part B funds.

83.     Attachment A to Exhibit 15 shows that CCPS received $12,759,884.00 in "Flowthrough" IDEA funds for the 2021-2022 school year.

84.     Attachment A to Exhibit 15 shows that CPS received $8,946,388.00 in "Flowthrough" IDEA funds for the 2021-2022 school year.

85.     Attachment A to Exhibit 15 shows that LCPS received $13,096,542.00 in "Flowthrough" IDEA funds for the 2021-2022 school year.

86.     Attachment A to Exhibit 15 shows that VBCPS received $15,241,466.00 in "Flowthrough" IDEA funds for the 2021-2022 school year.

A.B.

87.     A.B. is eligible for special education from CCPS due to an intellectual disability and speech language impairment. Exhibit 1.

88.     As a result of A.B.'s intellectual disability and speech language impairment, A.B. has global developmental impairments that adversely affect her educational abilities and performance. *Id.*

89.     A.B. struggles with short-term memory, understanding complex academic concepts, problem solving, and receptive and expressive speech. *Id.*

90.     According to A.B.'s March 26, 2020 IEP, A.B. received two hours of speech language therapy a month, thirty minutes of physical therapy each month, three hours, and forty-five minutes of academic support in science and social studies every two weeks, seven and a half hours of specialized education per subject (language arts/English, reading, math) every two weeks, and specialized transportation. *Id.*

91.     A.B.'s IEP states that she "does best with hands-on learning." *Id.*

92.     A.B.'s March 26, 2020 IEP does not state whether her instruction and/or services will be in-person or virtual.

93.     A.B.'s March 26, 2020 IEP requires direct speech language therapy, physical therapy, academic support, and special education to accommodate her disability so she can receive a FAPE. *Id.*

94.     On March 13, 2020, CCPS ceased all in-person education due to the COVID-19 pandemic.

95.     As a result of the March 13, 2020 closure of CCPS schools, CCPS altered A.B.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or participation of parents.

96.     The alterations and concomitant placement of A.B. at home receiving virtual instruction and services was procedurally defective because CCPS:

a.      Altered A.B.'s IEP to complete virtual instruction without prior written notice or any written notice;

b.      Altered A.B.'s IEP without the meaningful participation of her parents;

c.      Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing A.B.'s placement from in-person instruction and services to home placement with virtual instruction and services;

d.      Failed to ensure that A.B. could access a free and appropriate public education on the same level as her non-disabled peers.

97.     During the 2019-2020 school year, from March 13, 2020 through June 12, 2020, A.B. attended school at home receiving virtual instruction and services.

98.     Upon information and belief, during the 2020-2021 school year, A.B. attended school at home with virtual instruction and services until March of 2021 when a hybrid option was offered by CCPS.

99.     Plaintiff Jennifer Bills initiated administrative due process proceedings against defendants under 20 U.S.C. § 1415(i)(2), on behalf of A.B., but did not exhaust their administrative remedies because their claims fall within exceptions specified by law.

100.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

T.A.

101.    T.A. is eligible for special education from CPS and LCPS due to multiple disabilities. Exhibit 2.

102.    As a result of T.A.'s health impairment, T.A. has global developmental impairments that adversely affect his educational abilities and performance. *Id.*

103.    T.A. struggles with expressive and receptive language, social skills, controlling negative behaviors, functional academics, and activities of independent functioning. *Id.*

104.    According to T.A.'s February 25, 2019 Amended IEP, T.A. received twenty-eight and a half hours of special education per week, sixty minutes of direct speech language therapy per week, thirty minutes of consultative speech language therapy per week, forty-five minutes of consultative occupational therapy a week, extended school year services, and specialized transportation. *Id.*

105.    According to T.A.'s February 25, 2019 Amended IEP, "[T.A.] requires intensive staff support in all areas. He requires a highly structured environment and individualized/modified instruction to meet his…needs." *Id.*

106.    T.A.'s IEP does not state whether his instruction and/or services will be in-person or virtual.

107.    T.A. requires direct support, speech language therapy, and occupational therapy to receive a FAPE. *Id.*

108.    On March 16, 2020, CPS ceased all in-person education due to the COVID-19 pandemic.

109.    As a result of the March 16, 2020 closure of CPS schools, CPS altered T.A.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

110.    The alterations and concomitant placement of T.A. at home receiving virtual instruction and services was procedurally defective because CPS:

      a.      Altered T.A.'s IEP to complete virtual instruction without prior written notice, or any written notice;

      b.      Altered T.A.'s IEP without the meaningful participation of his parents;

      c.      Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing T.A.'s placement from in-person instruction and services to home placement with virtual instruction and services;

      d.      Failed to ensure that T.A. could access a free and appropriate public education on the same level as his non-disabled peers.

111.    During the 2019-2020 school year, from March 16, 2020 through May of 2020, T.A. attended school at home receiving virtual instruction and services from CPS.

112.    On May 13, 2020, T.A. moved to the Loudoun County Public School District and became eligible for special education services under IDEA from LCPS.

113.    During the 2020-2021 school year, T.A. attended school at home with virtual instruction and services until October of 2020 when a hybrid option was offered by LCPS.

114.    Plaintiff Karen Altobello initiated administrative due process proceedings against defendants under 20 U.S.C. § 1415(i)(2), on behalf of T.A., but did not exhaust their administrative remedies because their claims fall within exceptions specified by law.

115.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

W.T.

116.    W.T. is eligible for special education from VBCPS due to his health impairment arising from his diagnosis of autism. Exhibit 3.

117.    As a result of W.T.'s health impairment, W.T. has global developmental impairments that adversely affect his educational abilities and performance. *Id.*

118.    W.T. struggles with communication skills, independent functioning, fine motor skills, and social skills. *Id.*

119.    According to W.T.'s January 8, 2020 IEP, W.T. received twenty-nine hours and fifteen minutes of special education per week, sixty minutes of direct speech language therapy per week, thirty minutes of consultative occupational therapy a week, extended school year services, and specialized transportation. *Id.*

120.    According to W.T.'s January 8, 2020 IEP, W.T. "requires specialized instruction and support…[classroom] assistants coordinate his activities and participation levels." *Id.*

121.    W.T.'s 2020 IEP does not state whether his instruction and/or services will be in-person or virtual.

122.    W.T. requires direct support, speech language therapy, and occupational therapy to receive a FAPE. *Id.*

123.    On March 16, 2020, VBCPS ceased all in-person education due to the COVID-19 pandemic.

124.    As a result of the March 16, 2020 closure of VBCPS schools, VBCPS altered W.T.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

125.    The alterations and concomitant placement of W.T. at home receiving virtual

instruction and services was procedurally defective because VBCPS:

      a.     Altered W.T.'s IEP to complete virtual instruction without prior written notice, or any written notice;

      b.     Altered W.T.'s IEP without the meaningful participation of his parents;

      c.     Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing W.T.'s placement from in-person instruction and services to home placement with virtual instruction and services;

      d.     Failed to ensure that W.T. could access a free and appropriate public education on the same level as his non-disabled peers.

126.    During the 2019-2020 school year, from March 16, 2020 through June 12, 2020, W.T. attended school at home receiving virtual instruction and services.

127.    Upon information and belief, during the 2020-2021 school year, W.T. attended school at home with virtual instruction and services until March of 2021 when a hybrid option was offered by VBCPS.

128.    Plaintiff John Tignor initiated administrative due process proceedings against defendants under 20 U.S.C. § 1415(i)(2), on behalf of W.T., but did not exhaust their administrative remedies because their claims fall within exceptions specified by law.

129.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

<u>A.D.</u>

130.    A.D. is eligible for special education from ACPS due to a health impairment arising from his diagnosis of autism.  Exhibit 4.

131.    As a result of A.D.'s autism, A.D. has global developmental impairments that adversely affect his educational abilities and performance.  *Id.*

132.    A.D. struggles with reading and requires a high degree of individualized attention and instruction.  *Id.*

133.    According to A.D.'s, 2020 IEP, A.D. received various accommodations during the school day, including but not limited to, daily seventy-five-minute specialized English language instruction, daily sixty-minute specialized math instruction, daily twenty-minute behavior management instruction, daily one hour and fifty-five minutes of behavior support, daily twenty-minute social skills instruction, two hours of occupational therapy per month, and six hours of speech language therapy per month. *Id.*

134.    According to A.D.'s IEP, he "requires the use of visual supports/schedules, token reinforcement schedule, extended wait time, and a structured work system."  *Id.* Additionally, "he requires a lot of sensory input." *Id*.

135.    A.D.'s IEP does not state whether his instruction and/or services will be in-person or virtual.

136.    A.D. requires direct accommodations, specialized instruction, occupational therapy, and speech language therapy to accommodate his disability so he can receive a FAPE.  *Id.*

137.    On March 16, 2020, ACPS ceased all in-person education due to the COVID-19 pandemic.

138.    As a result of the March 16, 2020 closure of ACPS schools, ACPS altered A.D.'s

IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

139.    The alterations and concomitant placement of A.D. at home receiving virtual instruction and services was procedurally defective because ACPS:

       a.    Altered A.D.'s IEP to complete virtual instruction without prior written notice, or any written notice;

       b.    Altered A.D.'s IEP without the meaningful participation of his parents;

       c.    Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing A.D.'s placement from in-person instruction and services to home placement with virtual instruction and services;

       d.    Failed to ensure that A.D. could access a free and appropriate public education on the same level as his non-disabled peers.

140.    During the 2019-2020 school year, from March 16, 2020 through June 19, 2020, A.D. attended school at home receiving virtual instruction and services.

141.    During the 2020-2021 school year, A.D. attended school at home with virtual instruction and services until the end of March of 2021, when Plaintiff Diana Duplantier relocated out of state with A.D.

142.    Plaintiff Diana Duplantier initiated administrative due process proceedings against defendants under 20 U.S.C. § 1415(i)(2), on behalf of A.D., but did not exhaust their administrative remedies because their claims fall within exceptions specified by law.

143.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

J.T.

144.    J.T. is eligible for special education from VBCPS due to a health impairment arising from her medical diagnosis of a traumatic brain injury (TBI). Exhibit 5.

145.    As a result of J.T.'s traumatic brain injury, J.T. has global developmental impairments that adversely affect her educational abilities and performance.  *Id.*

146.    J.T. struggles with fine motor skills, activities of daily living, social skills, communication, and vision.  *Id.*

147.    According to J.T.'s IEP, J.T. received various accommodations, including but not limited to, approximately four and a half hours of daily specialized instruction, forty minutes of visual impairment services a month, forty minutes of speech language therapy a month, thirty minutes of occupational therapy a month, fifteen minutes of physical therapy a month, specialized transportation, and extended school year services. *Id.*

148.    J.T. has significant disabilities and "relies on staff and caregivers for her daily needs." *Id.*

149.    J.T.'s IEP does not state whether her instruction and/or services will be in-person or virtual.

150.    J.T requires direct accommodations, specialized instruction, occupational therapy, speech language therapy, and physical therapy to accommodate her disability so she can receive a FAPE. *Id.*

151.    On March 16, 2020, VBCPS ceased all in-person education due to the COVID-19 pandemic.

152.    As a result of the March 16, 2020 closure of VBCPS schools, VBCPS altered J.T.'s IEP for the 2019-2020 school year to complete virtual instruction and services without any prior

20

written notice and/or the proper participation of parents.

153.    The alterations and concomitant placement of J.T. at home receiving virtual instruction and services was procedurally defective because VBCPS:

> a.    Altered J.T.'s IEP to complete virtual instruction without prior written notice, or any written notice;

> b.    Altered J.T.'s IEP without the meaningful participation of her parents;

> c.    Failed to reconvene an IEP meeting at a time that was mutually agreeable with parents prior to, or even soon after, changing J.T.'s placement from in-person instruction and services to home placement with virtual instruction and services;

> d.    Failed to ensure that J.T. could access a free and appropriate public education on the same level as her non-disabled peers.

154.    During the 2019-2020 school year, from March 16, 2020 through June 19, 2020, J.T. attended school at home receiving virtual instruction and services.

155.    Plaintiff Joleen Booth initiated administrative due process proceedings against defendants under 20 U.S.C. § 1415(i)(2), on behalf of J.T., but did not exhaust her due process remedies because their claims fall within exceptions specified by law.

156.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

157.    J.T. is eligible for special education from APs due to a health impairment arising from her medical diagnosis of a traumatic brain injury (TBI). Exhibit 6.

158.    As a result of J.T.'s traumatic brain injury, J.T. has global developmental impairments that adversely affect her educational abilities and performance.  *Id.*

159.    J.T. struggles with fine motor skills, activities of daily living, social skills,

communication, and vision.  *Id.*

160.    According to J.T.'s IEP, J.T. received various accommodations, including but not limited to, approximately four and a half hours of daily specialized instruction, forty minutes of visual impairment services a month, forty minutes of speech language therapy a month, thirty minutes of occupational therapy a month, fifteen minutes of physical therapy a month, specialized transportation, and extended school year services. *Id.*

161.    J.T. has significant disabilities and "relies on staff and caregivers for her daily needs." *Id.*

162.    J.T.'s IEP does not state whether her instruction and/or services will be in-person or virtual.

163.    J.T requires direct accommodations, specialized instruction, occupational therapy, speech language therapy, and physical therapy to accommodate her disability so she can receive a FAPE. *Id.*

164.    On March 16, 2020, APS ceased all in-person education due to the COVID-19 pandemic.

165.    While J.T. was not affected by the March 26, 2020, closure of APS schools, as a result of the March 16, 2020 closure of APS schools, APS altered similarly situated student's IEP for the 2019-2020 school year to complete virtual instruction and services without any prior written notice and/or the proper participation of parents.

166.    APS retains the ability to unilaterally close the school district as it sees fit.

167.    Plaintiffs have neither waived nor abandoned any claims or arguments under IDEA or state law.

CLASS ACTION ALLEGATIONS

General Class Action Allegations

168.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated with school aged children with disabilities covered by IDEA in Virginia and their parents, for the purpose of asserting the claims alleged in this complaint on a common basis.

169.     A class action is a superior means, and the only practical means, by which plaintiffs and unknown class members can challenge the actions of the VDOE and SCHOOL DISTRICTS in restricting the rights of named plaintiffs, and similarly situated class members, under IDEA, the Regulations, the ADA, § 504, the Virginia Act, the VDA, § 1983 and RICO without providing them due process of law.

170.     The action is brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 (a) and 23(b)(2).

171.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(2), where applicable.

Rule 23(a)(1):  Numerosity

172.     The class is so numerous that joinder is impracticable.

173.     All the putative class members are children with disabilities under IDEA in Virginia and their parents.

174.     The total number of individuals denied the procedural safeguards under IDEA– either in the past, currently, or in the future – will likely number in the thousands.

Rule 23(b)(2):  Commonality

175.     Common questions of law and fact exist as to all members of the class.

176.     All class members seek relief on the common legal question of whether the VDOE and SCHOOL DISTRICTS violated IDEA, the Regulations, the ADA, § 504, the Virginia Act, § 1983 and RICO by altering plaintiffs' IEPs and changing their educational placement, without following the regulations promulgated under the statutes.

177.     All class members also present common factual questions regarding VDOE's and SCHOOL DISTRICTS' closures of schools and the putative class members' concomitant educational placement.

178.     All class members also present common factual questions regarding the VDOE's, the School Districts', similarly situated LEAs', and the individual defendants' assurances to the U.S. DOE regarding IDEA Part B funding.

179.     All class members also present common factual questions regarding whether the VDOE failed to appropriately monitor SCHOOL DISTRICTS, conduct proper oversight of SCHOOL DISTRICTS, and provide SCHOOL DISTRICTS with the resources and expertise necessary to protect its disabled students' procedural safeguards guaranteed by IDEA.

180.     All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2)  Issue a declaratory judgment that the Defendant School Districts and other similarly situated LEAs'  unilateral change of placement for plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of IDEA and discriminated against plaintiffs under IDEA, the Regulations, § 504, the ADA, the Virginia Act, and § 1983; 3)  Issue a declaratory judgment that the VDOE failed to monitor and provide proper oversight and resources to SCHOOL DISTRICTS during the COVID-19 pandemic as required under IDEA and the Regulations; 4)  Order the VDOE and SCHOOL DISTRICTS to comply with

the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 5) Assign a Special Monitor to: a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs; b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; 6) Require the VDOE, SCHOOL DISTRICTS, and similarly situated LEAs, to comply with IDEA, the Regulations, the ADA, § 504, the Virginia Act and §1983 in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers; and 7) Assign a RICO Special Monitor to: a) oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present; b) oversee the defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA; c) ensure any IDEA Part B Funds that defendants spent on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor.

### Rule 23(a)(3): Typicality

181.    Plaintiffs' claims are typical of the claims of other respective members of the class.

182.    Like all members of the class, plaintiffs are children with disabilities under IDEA in Virginia or their parents, who were denied the procedural due process or substantive rights provided by IDEA, the Regulations, the ADA, § 504, the Virginia Act and § 1983.

183. All members of the class claim that the VDOE, SCHOOL DISTRICTS and similarly situated LEAs, violated their procedural and substantive due process rights provided by IDEA, the Regulations, the ADA, § 504, the Virginia Act and § 1983.

184. All members of the class, including named plaintiffs, seek a declaratory judgment that the actions of defendants were unlawful and an injunction preventing defendants from committing such actions in the future.

185. There is nothing distinctive about named plaintiffs' claims for declaratory, injunctive or pendency relief that would lead to a different result in their case than in any case involving other class members.

<u>Rule 23(a)(4): Adequacy</u>

186. Plaintiffs are adequate representatives of the class because their interest in the vindication of their rights is aligned with the interests of the other class members.

187. Plaintiffs are members of the class, and their interests do not conflict with those of the other class members with respect to any claims.

188. Plaintiffs are represented by attorneys from the Brain Injury Rights Group, who have experience litigating complex civil rights matters in federal court and have detailed knowledge of IDEA, the Regulations, § 504, the ADA, the Virginia Act, § 1983 and other relevant issues.

189. Class counsel has developed and continues to develop relationships with plaintiffs and others similarly situated.

<u>Rule 23(b)(2):  Declaratory and Injunctive Relief Class</u>

190.    A  class  action  is  appropriate  for  declaratory  and  injunctive  relief  under  Rule

23(b)(2) because defendants have acted on grounds that apply generally to the class – namely the

unilateral change of placement in March of 2020, from in-person instruction and services to virtual

instruction and services – without complying with plaintiffs' rights under IDEA, the Regulations,

§ 504, the ADA, the Virginia Act and § 1983.

191.    The class seeks declaratory and injunctive relief to enjoin the VDOE, the Defendant

School Districts and similarly situated LEAs from denying the rights guaranteed under the IDEA,

the Regulations, § 504, the ADA, the Virginia Act and § 1983 to all children with disabilities

within Virginia.

192.    Class status is particularly appropriate because there is a risk that any individual

member's claim for declaratory or injunctive relief will become moot before the litigation is

resolved.  There is a risk that a class member that is or was a senior during the 2019-2020 and

2020-2021 school years will lose eligibility for injunctive relief under IDEA.

<u>Rule 23(b)(3):  Damages Class</u>

193.    No class damages are sought at this time, but no claims for damages should be

deemed to be waived by the lawsuit.

CAUSES OF ACTION

COUNT ONE
SYSTEMIC VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION
ACT

Systemic Violation 1:  Prior Written Notice

194.    Plaintiffs reiterate, repeat, and affirm each allegation set forth above as if fully set forth herein.

195.    20 U.S.C. § 1415(c)(1) requires that a LEA give prior written notice of any action proposed by the LEA regarding the provision of a FAPE.

196.    SCHOOL DISTRICTS (collectively) did not give Plaintiffs prior written notice of their closure of schools and alteration of plaintiff's IEPs and school placements from in-person instruction and services to virtual instruction or services.

197.    VDOE failed to appropriately monitor and conduct oversight of SCHOOL DISTRICTS to ensure SCHOOL DISTRICTS complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.


Systemic Violation 2: Educational Placements

198.    20 U.S.C. § 1414(e) states that each LEA and SEA "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."

199.    20 U.S.C. § 1415(j) states "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).

200.    20 U.S.C. § 1415(j) obligates courts to implement pendency placement via an automatic injunction, without analysis of the traditional injunction elements.  *Ridley School Dist. v. M.R.*, 2015 WL 1619420, *4 (2015) (The U.S. Supreme Court "has emphasized that the provision's text is 'unequivocal' and 'states plainly' that the child 'shall' remain in his current educational placement 'during the pendency of any proceedings initiated under the act.'").

201.    School Districts did not ensure that the parents of each child with a disability were included as members of any IEP Team that made decisions on the educational placement of their children.

202.    School Districts did not maintain plaintiffs' pendency placement through in-person instruction.

203.    VDOE failed to appropriately monitor and conduct oversight of School Districts to ensure School Districts complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.

204.    Plaintiffs are entitled to all appropriate relief available under IDEA, including injunctive relief declaring that the class members' pendency placement is in-person instruction and requiring the VDOE and School Districts to comply with IDEA in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers.

Systemic Violation 3:  Failure to Reconvene IEP Meetings

205.    20 U.S.C. § 1414(d)(3)(F) states that an IEP may be amended by the entire IEP Team.

206.    School Districts did not reconvene IEP Team Meetings to change plaintiffs' IEPs to provide for complete virtual instruction and services.

207.    VDOE failed to appropriately monitor and conduct oversight of School Districts to

ensure that School Districts complied with IDEA's procedural safeguards upon the March 2020 closing of its schools.

Systemic Violation 4:  Discrimination on the Basis of Disability and Denial of Access to Educational Services

208.    Defendant VDOE must ensure that each LEA in Virginia, including School Districts, takes steps to ensure that children with disabilities within their jurisdiction have access to the same educational opportunities as their non-disabled peers.  20 U.S.C. § 1412(a)(2); §1413(a)(1); 34 C.F.R. § 300.110.

209.    Defendants' systemic failure to ensure that children with disabilities had appropriate access to the same educational opportunities as their non-disabled peers is a violation of IDEA.

210.    Defendants' actions have caused plaintiffs damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs.

COUNT TWO
VIOLATION OF 8 VAC § 20-81-170

211.    Plaintiffs reiterate, repeat, and reaffirm each allegation set forth above as if fully set forth herein.

212.    As described at length above, defendants failed to provide plaintiffs procedural safeguards upon the termination of in-person instruction in March of 2020.

213.    Defendants failed to comply with the procedural requirements for prior written notice, educational placements, pendency placements, IEP Team Meetings and equal access to instruction and services for plaintiffs in violation of 8 VAC § 20-81-170.

214.    Defendants' actions have caused plaintiffs damages, including regressions in skills and loss of competencies regarding the goals and objectives outlined in their IEPs.

215.    All class members seek injunctive relief requesting that the Court:  1)  Issue a declaratory judgment that the class members' pendency placement is in-person instruction and services; 2)  Issue a declaratory judgment that School Districts' unilateral change of placement for plaintiffs from in-person instruction and services to virtual instruction and services violated the procedural safeguards of the Regulations; 3)  Issue a declaratory judgment that the VDOE failed to monitor and provide proper oversight and resources to School Districts during the COVID-19 pandemic as required under IDEA and the Regulations; 4)  Order the VDOE and School Districts to comply with the procedural safeguards guaranteed by 8 VAC § 20-81-170 for the 2021-2022 school year for the class members unless the U.S. DOE issues IDEA waivers; 5) Assign a Special Monitor for a period of one year to:   a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs;  b)  make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; c) ensure the expert recommendations are included in writing in the class members' IEP documents; 6)  Require the VDOE and School Districts to comply with the Regulations in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers.

COUNT THREE
VIOLATION OF THE REHABILITATION ACT, 29 U.S.C. § 794

216.    Plaintiffs reiterate, repeat, and reaffirm each allegation set forth above as if fully set forth herein.

217.    Section 504 of the Rehabilitation Act of 1973 and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

218.    Among other requirements, entities subject to Section 504 must provide equal opportunity to qualified persons with disabilities to participate in or benefit from any aid, benefit, or service they make available.  34 C.F.R. § 104.4(b)(1)(ii).

219.    Entities subject to Section 504 must avoid otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.  34 C.F.R. § 104.4(b)(1)(vii).

220.    A person has a disability under Section 504 if they have a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

221.    Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working.  42 U.S.C. § 12102(2)(A).

222.    A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of federal financial assistance.  *See*

32

29 U.S.C. § 794(a).

223.    A "program or activity" includes local education agencies, public boards of education, and school systems.  29 U.S.C. § 794(b)(2)(B), 20 U.S.C. § 7801(26). A "recipient of federal financial assistance" is a public or private agency or other entity to which federal financial assistance is extended directly or through another recipient.  34 C.F.R. § 104.3(f).

224.    A.B., T.A., W.T., A.D., and J.T. are individuals having impairments, including but not limited to, specific learning disorders and autism, that affect the major life activity of learning.

225.    A.B., T.A., W.T., A.D., and J.T.. are otherwise qualified individuals with disabilities who meet essential eligibility requirements to receive services from or participate in the programs or activities of the School Districts.  42 U.S.C. § 12131(2); 29 U.S.C. § 794(a).

226.    The VDOE and School Districts receive federal funds to comply with § 504.

227.    The VDOE and School Districts are entities subject to the non-discrimination requirements of Section *§ 504*. 29 U.S.C. § 794(a);  34 C.F.R. § 104.4.

228.    School Districts' closure of in-person instruction in March of 2020 discriminated against A.B., T.A., W.T., A.D., and J.T., as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs, and services as compared to their non-disabled peers.  34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv).

229.    School Districts' closure of in-person instruction in March of 2020 was illegal disability-based discrimination that violated Section 504 of the Rehabilitation Act of 1973.

230.    As a proximate cause of these violations of Section 504, plaintiffs have suffered harm as set forth above.

COUNT FOUR
VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101

231.    Plaintiffs incorporate all prior allegations.

232.    Title II of the ADA and its implementing regulations forbid public entities, including local education agencies, to exclude or deny people with disabilities the benefits of its services, programs, or activities, or to discriminate based on disability.  42 U.S.C. § 12132; 28 C.F.R. § 35.104.

233.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service.  28 C.F.R. § 35.130(b)(1)(h) & (vii).  Prohibited discrimination additionally includes the failure to make reasonable modifications as necessary to avoid discrimination against an individual based on their disability.   28 C.F.R. § 35.130(b)(7).

234.    An "individual with a disability" is one who has a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

235.    Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working.  42 U.S.C. § 12102(2)(A).

236.    A "qualified individual with a disability" is one who, with or without reasonable accommodations for his or her disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of the public entity. 42 U.S.C. § 12131(2).

237.    A.B., T.A., W.T., A.D., and J.T are individuals having impairments, including but

not limited to, specific learning disorders and ADHD, that affect the major life activity of learning.

238.    Plaintiffs' impairments affect their major life activities including learning.   42 U.S.C. § 12102(2)(A).

239.    Plaintiffs are otherwise qualified individuals with disabilities who meet the essential eligibility requirements to receive services from or participate in the programs or activities of School Districts.  42 U.S.C. § 12131(2).

240.    The VDOE and School Districts are public entities forbidden to discriminate based on disability.  42 U.S.C. § 12132.

241.    School Districts' closure of in-person instruction in March of 2020 discriminated against A.B., T.A., W.T., A.D., and J.T.. as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs, and services as compared to their non-disabled peers.  34 C.F.R. §§ 104.4(a), 104.4(b)(ii) and (iv).

242.    As a proximate cause of these violations of Title II of the Americans with Disabilities Act, plaintiffs have suffered harm as set forth above.

COUNT FIVE
VIOLATION OF THE VIRGINIA HUMAN RIGHTS ACT

243.    Plaintiffs incorporate all prior allegations.

244.    The Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3900-03, prohibits educational institutions to exclude or deny people with disabilities the full benefits of their programs, activities, and facilities or to discriminate based on disability.

245.    The VDOE and School Districts are educational service agencies and other public institutions or agencies as the term is defined in 8 VAC § 20-81-10. The VDOE and School Districts are educational institutions pursuant to § 2.2-3900(B)(1) of the Virginia Act.

246.    Plaintiffs are persons with disabilities as that term is defined in the Virginia Act because they have impairments, including but not limited to, specific learning disorders and autism, that affect the major life activity of learning.

247.    School Districts' closure of in-person instruction in March of 2020 discriminated against A.B., T.A., W.T., A.D., and J.T., as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs and services as compared to their non-disabled peers.

248.    As a proximate cause of these violations of the Virginia Act, Plaintiffs have suffered harm as set forth above.

## COUNT SIX
## VIOLATION OF VIRGINIANS WITH DISABILITIES ACT

249.    Plaintiffs incorporate all prior allegations.

250.    The Virginians with Disabilities Act ("VDA"), Va. Code Ann. § 51.5-1, protects Virginians with disabilities from discrimination under any state program or activity, by employers in hiring and promotion, by educational institutions receiving state funds, in the use of public places and in places of public accommodation, in housing, and in the exercise of the right to vote.

251.    The VDOE and School Districts are educational service agencies and other public institutions or agencies as the term is defined in 8 VAC § 20-81-10. The VDOE and School Districts are educational institutions pursuant to the VDA.

252.    Plaintiffs are persons with disabilities as that term is defined in the VDA because they have impairments, including but not limited to, specific learning disorders and autism, that affect the major life activity of learning.

253.    School Districts' closure of in-person instruction in March of 2020 discriminated against A.B., T.A., W.T., A.D., and J.T. as persons with disabilities, who necessitate in-person services including occupational therapy, speech therapy, social work services and resource room services, by denying them equal access and otherwise limiting their access to education, programs and services as compared to their non-disabled peers.

254.    As a proximate cause of these violations of the VDA, Plaintiffs have suffered harm as set forth above.

COUNT SEVEN
VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
(42 U.S.C. §1983) EQUAL PROTECTION

255.    Plaintiffs incorporate all prior allegations.

256.    Section 1 of the Fourteenth Amendment provides:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> U.S. CONST., amend. XIV, § 1.

257.    In order to provide a remedy for violations of the Fourteenth Amendment, Congress has enacted § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

> 42 U.S.C. § 1983.

258.    Defendants deprived plaintiffs of their rights as guaranteed by the Fourteenth Amendment to the United States Constitution, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, when it closed its in-person instruction in March of 2020.

259.    Specifically, Plaintiffs have been deprived of their right to equal protection under the Fourteenth Amendment by the acts of defendants under the color of state authority.

260.    Defendants' closure of schools in March of 2020 resulted in a disparate impact on

Plaintiffs due to their disabilities in violation of the ADA and § 504.

261.    Plaintiffs are all students with disabilities under the ADA and § 504.

262.    Defendants closed schools in March of 2020 in response to the COVID-19

Pandemic.

263.    As a direct and proximate result thereof, plaintiffs suffered harm including

significant regressions in skills and loss of competencies.

264.    Defendants rendered the plaintiffs more vulnerable to harm by closing its schools.


COUNT EIGHT
VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
(42 U.S.C. §1983) SUBSTANTIVE DUE PROCESS

265.    Plaintiffs incorporate all prior allegations.

266.    Section 1 of the Fourteenth Amendment provides:

> All persons born or naturalized in the United States and subject to
> the jurisdiction thereof, are citizens of the United States and of the
> State wherein they reside. No State shall make or enforce any law
> which shall abridge the privileges or immunities of citizens of the
> United States; nor shall any State deprive any person of life, liberty,
> or property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

> U.S. CONST., amend. XIV, § 1.

267.    In order to provide a remedy for violations of the Fourteenth Amendment, Congress

has enacted § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress, except

that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

268.    Defendants deprived plaintiffs of their substantive due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, when it closed its in-person instruction in March of 2020.

269.    The Virginia Constitution states "[t]hat free government rests, as does all progress, upon the broadest possible diffusion of knowledge, and that the Commonwealth should avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an effective system of education throughout the Commonwealth." Va. Const. Art. I, § 15.

270.    Article VIII of the Virginia Constitution ensures that education is a fundamental right for all children of school age in the Commonwealth: "The General Assembly shall provide a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained." Va. Const. Art. VIII, § 1.

271.    The Supreme Court of Virginia affirmed that "education is a fundamental right under the Constitution." *Scott v. Commonwealth*, 247 Va. 379 (1994).

272.    The actions of VDOE and School Districts as alleged above are in violation of the Virginia Constitution as set forth above.

273.    As a proximate cause of these violations of the Virginia Constitution, Plaintiffs have suffered harm as set forth above.

COUNT NINE
VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT ("RICO"), 18 U.S.C. §1962(c)
(Against Individual Defendants)

274.    Plaintiffs incorporate by reference all preceding paragraphs.

275.    This RICO cause of action arises from a scheme by individual defendants James F.

Lane, in his official capacity as State Superintendent, Dr. Gregory C. Hutchings, Jr., in his official

capacity as Superintendent of Alexandria City Public School District, Mervin B. Daugherty, Ed.

D., in his official capacity as Superintendent of Chesterfield County Public School District, Dr.

Jared Cotton in his official capacity as Superintendent of Chesapeake City Public School District,

Dr. Scott A. Ziegler in his official capacity as Superintendent of Loudoun County Public School

District, and Dr. Aaron C. Spence, in his official capacity as Superintendent of Virginia Beach

City Public Schools ("individual defendants"), to fraudulently use their enterprises – the Virginia

Department of Education ("VDOE"), Alexandria City Public School District ("ACPS"),

Chesterfield County Public School District ("CCPS"), Chesapeake City Public School District

(CPS), Loudoun County Public School District ("LCPS"), Amherst County Public School District

("APS"), and Virginia Beach City Public School District ("VBCPS") respectively – to defraud

plaintiffs, the beneficiaries of IDEA Part B, of over $690,500,982.00 by making false assurances

that the VDOE and its LEAs complied with IDEA during the COVID-19 pandemic.  Exhibit 16,

Part B Application for Fiscal Year 2020.

276.    Each plaintiff is a person as defined in 18 U.S.C. §§ 1961(3) and 1964(c).

277.    Each individual defendant is a person as defined in 18 U.S.C. §§ 1961 (3) and 1964

(c).

41

The Applicable Statutes

278.    Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt."

279.    Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any of the RICO substantive provisions, including § 1962(c).

280.    18 U.S.C. § 1964(a) creates a private cause of action to "prevent and restrain violations" of section 1962.

The Enterprises – VDOE, ACPS, CCPS, CPS, and VBCPS

281.    The enterprises, as described in 18 U.S.C. § 1961(4), are the VDOE, ACPS, CCPS, CPS, LCPS, and VBCPS.  Each enterprise is an association in fact consisting of individuals who function together as a continuing unit with consensual decision-making authority. Individual defendants herein conduct the affairs of their respective enterprise in part through predicate activity that defrauds plaintiffs through false assurances that the VDOE, ACPS, CCPS, CPS, LCPS, VBCPS, and similarly situated Local Education Agencies ("LEAs") complied with IDEA during the COVID-19 pandemic.  Exhibits 13, 14, and 15.  For example, Dr. Gregory Hutchings, Jr., in his official capacity as current Superintendent of ACPS, are among the individuals who conduct the operation of the enterprise ACPS in part through racketeering activity, as described further below.

282.    VDOE assured the U.S. DOE that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in

accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id.*

283.    VDOE assured the U.S. DOE that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute under § 300.154(a)(3)." *Id.*

284.    Each individual defendant named herein conducted the affairs of his/her respective enterprise.

285.    Each enterprise operated as an ongoing organization separate and distinct from the individual defendants.

286.    Each enterprise has a structure separate and apart from the racketeering activity that the individual defendants engaged. Each enterprise is a governmental entity which consists of numerous different individuals who function together with consensual decision-making authority to conduct the management and operation of the respective governmental entity.

287.    Each enterprise had longevity sufficient to permit their respective individual RICO defendants to pursue the enterprise's purpose.

288.    The activities of each enterprise affected interstate commerce through mail and interstate wires to and from the U.S. DOE in Washington D.C. Each enterprise affected interstate commerce through each individual defendant's unlawful transmission of assurances of compliance with IDEA via interstate electronic mail that was fraudulently prepared and submitted in furtherance of the racketeering scheme. Each enterprise affected interstate commerce based on

each individual defendant's collection of IDEA Part B funds wired to them through interstate banks from the U.S. DOE based on these fraudulent assurances.

## The Racketeering Violation

289.    On or about March of 2020 and continuing up through the date of the filing of this complaint, each individual RICO defendant named herein, a person associated with or employed by their respective enterprise, did knowingly and unlawfully conduct, or participate, directly or indirectly, in each enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and 1961 (5), all in violation of 18 U.S.C.§ 1962(c).

290.    Each defendant engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity within 10 years of each individual act.

291.    Each individual defendant's actions violated the federal mail and wire fraud statutes, 18 U.S.C. § 1341 and 18 U.S.C. §§ 1343, predicate acts for purposes of racketeering.

292.    From March of 2020 through the present, each individual RICO defendant knowingly and intentionally engaged in an ongoing pattern of racketeering activity under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud and mail fraud as set forth below. The fraudulent schemes involved using the interstate wires to defraud plaintiffs, the beneficiaries of IDEA Part B Funds, of their procedural and substantive rights.

Predicate Acts by Officials of Each Enterprise

Defendant James Lane, Ph.D. for the Virginia Department of Education ("VDOE")

293.   Upon information and belief, Defendant James Lane, Ph.D., in his official capacity as State Superintendent for VDOE, via mail fraud through interstate commerce, made assurances to the U.S. DOE, between January of 2019 and July of 2019, that VDOE had policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. Exhibit 14, Superintendent's Memo #177-19, July 26, 2019.

294.   The Superintendent distributed a memo that noted that the SCHOOL DISTRICTS provided certifications that Virginia's application would comply with the IDEA and its federal implementing regulations, and that SCHOOL DISTRICTS would operate their Part B programs in accordance with all of the required assurances and certifications that are consistent with the VDOE's policies and procedures. *Id.*

295.   Upon information and belief, VDOE collected IDEA Part B funds from the U.S. DOE via wire fraud through interstate commerce. *See id.*

296.   Superintendent's Memo #177-19, dated July 26, 2019, shows that VDOE received over $299 million from the U.S. DOE for FFY 2019-2020. *Id.*

297.   Attachment A to the memo also shows that ACPS received $3,418,247.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

298.   Attachment A also shows that CCPS received $12,094,729.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

299.   Attachment A also shows that CPS received $8,476,939.00 in "Flowthrough" IDEA funds for the 2019-2020 school year. *Id*.

300.   Attachment A also shows that LCPS received $11,868,637.00 in "Flowthrough"

IDEA funds for the 2019-2020 school year. *Id.*

301.    Attachment A also shows that VBCPS received 14,768,570.00 in "Flowthrough" IDEA funds for the 2019-2020 school year.

302.    Upon information and belief, Defendant James Lane, Ph.D., in his official capacity as State Superintendent for VDOE, via mail fraud through interstate commerce, made assurances to the U.S. DOE, between January of 2020 and July of 2020, that VDOE had policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. Exhibit 14, Superintendent's Memo #182-20, July 17, 2020.

303.    The Superintendent's memo additionally notified SCHOOL DISTRICTS that SCHOOL DISTRICTS provided certifications that its application would comply with the IDEA and its federal implementing regulations, and that SCHOOL DISTRICTS would operate its Part B program in accordance with all of the required assurances and certifications that are consistent with the VDOE's policies and procedures. *Id.*

304.    Upon information and belief, VDOE collected IDEA Part B funds from the U.S. DOE via wire fraud through interstate commerce. *See id.*

305.    Superintendent's Memo #182-20, dated July 17, 2020, shows that VDOE received over $308 million dollars from the U.S. DOE for FFY 2020-2021. *Id.*

306.    Attachment A to the memo also shows that ACPS received $3,581,726.00 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id*.

307.    Attachment A also shows that CCPS received $12,591,672.00 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id*.

308.    Attachment A also shows that CPS received $8,728,550 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id*.

309.    Attachment A also shows that LCPS received $12,589,312.00 in "Flowthrough IDEA funds for the 2020-2021 school year. *Id.*

310.    Attachment A also shows that VBCPS received 15,105,911.00 in "Flowthrough" IDEA funds for the 2020-2021 school year. *Id.*

311.    In addition, upon information and belief, Defendant James Lane, Ph.D., in his official capacity as State Superintendent for VDOE, made assurances, via mail fraud through interstate commerce, to the US DOE, between January of 2020 and July of 2020, that VDOE, ACPS, CCPS, CPS, and VBCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit 16, Virginia Part B Application.

312.    In addition, upon information and belief, Defendant James Lane, Ph.D., in his official capacity as State Superintendent for VDOE, made assurances, via mail fraud through interstate commerce, to the U.S. DOE, between January of 2020 and July of 2020, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

313.    In addition, upon information and belief, Defendant James Lane, Ph.D., in his official capacity as State Superintendent for VDOE, assured the U.S. DOE, via mail fraud through interstate commerce, between January of 2020 and July of 2020, that "[t]he Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 § CFR 300.154 and the State education agency, in order to ensure that the services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, include the provision of such services during the *pendency* of any dispute

47

under § 300.154(a)(3)." *Id*.

314.    Upon information and belief, VDOE collected the IDEA Part B funds from the U.S. DOE via wire fraud through interstate commerce.

315.    Upon information and belief, VDOE received IDEA Part B funds from the U.S. DOE, and then distributed them to the ACPS, CCPS, CPS, LCPS, and VBCPS by wire.

316.    Upon information and belief, ACPS, CCPS, CPS, LCPS, and VBCPS received the IDEA Part B funds from the VDOE and used them for unlawful purposes.

317.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Lane used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Upon information and belief, these interstate wires were collected by Defendant Lane in the years 2019, 2020 and are continuing to be collected, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the VDOE during the closure of ACPS, CCPS, CPS, LCPS, and VBCPS.

318.    Each use of wire communications in connection with the scheme to defraud constitutes the offense of wire fraud as prohibited by 18 U.S.C. § 1343.

319.    Contrary to the individual defendants' assurances, VDOE, ACPS, CCPS, CPS, LCPS, and VBCPS did not give plaintiffs prior written notice of their closure of schools and alteration of plaintiffs' IEPs and school placements from in-person instruction and services to virtual instruction or services during the COVID-19 pandemic.

320.    Contrary to the individual defendants' assurances, VDOE, ACPS, CCPS, CPS,

LCPS, and VBCPS did not ensure that the parents of each child with a disability were included as members of any IEP Team that made decisions on the educational placement of their children during the COVID-19 pandemic.

321.     Contrary to the individual defendants' assurances, VDOE, ACPS, CCPS, CPS, LCPS, and VBCPS did not maintain plaintiffs' pendency placement through in-person instruction during the COVID-19 pandemic.

322.     Contrary to the individual defendants' assurances, the VDOE, ACPS, CCPS, CPS, LCPS, and VBCPS did not reconvene IEP Team Meetings to change plaintiffs' IEPs to provide for complete virtual instruction and services during the COVID-19 pandemic.

Defendant Dr. Gregory C. Hutchings, Jr. for Alexandria City Public Schools ("ACPS")

323.     Upon information and belief, Defendant Dr. Gregory C. Hutchings, Jr., in his official capacity as Superintendent of ACPS, made assurances to the VDOE, between January of 2019 and July of 2019, that ACPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit 16.

324.     In addition, upon information and belief, Defendant Gregory C. Hutchings, Jr., in his official capacity as Superintendent of ACPS, made assurances to the VDOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

325.     In addition, upon information and belief, Dr. Gregory C. Hutchings, Jr., in his official capacity as current Superintendent of ACPS, made assurances to the VDOE, between January of 2020 and July of 2020, that CCPS had "policies and procedures in place as required by

Part B of the Individuals with Disabilities Education Act." *See id*.

326.    In addition, upon information and belief, Dr. Gregory C. Hutchings, Jr., in his official capacity as current Superintendent of ACPS, made assurances to the VDOE, between January of 2020 and July of 2020 that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

327.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Hutchings used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Hutchings used these interstate wires in 2020, and is continuing to use them, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected during the closure of ACPS.


Mervin B. Dougherty, Ed. D. for Chesterfield County Public Schools ("CCPS")

328.    Upon information and belief, Mervin B. Dougherty, in his official capacity as current Superintendent of CCPS, assured the VDOE, between January of 2019 and July of 2019, that CCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *Id.*

329.    In addition, upon information and belief, Mervin B. Dougherty, in his official capacity as current Superintendent of CCPS, assured the VDOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural

safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

330.    In addition, upon information and belief, Mervin P. Dougherty, in his official capacity as current Superintendent of CCPS, made assurances to the VDOE, between January of 2020 and July of 2020, that CCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *See id*.

331.    In addition, upon information and belief, Mervin B. Dougherty, in his official capacity as current Superintendent of CCPS, made assurances to the VDOE, between January of 2020 and July of 2020 that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

332.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Dougherty used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Dougherty used the interstate wires in the years 2019 and 2020, and is continuing to use them, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by CCPS during its closure.


Defendant Dr. Jared Cotton for Chesapeake Public Schools ("CPS")

333.    Upon information and belief, Dr. Jared Cotton, in his official capacity as current Superintendent of CPS, assured the VDOE, between January of 2019 and July of 2019, that CPS

had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *Id*.

334.    In addition, upon information and belief, Dr. Jared Cotton, in his official capacity as current Superintendent of CPS, assured the VDOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

335.    In addition, upon information and belief, Dr. Jared Cotton, in his official capacity as current Superintendent of CPS, made assurances to the VDOE, between January of 2020 and July of 2020, that CPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *See id*.

336.    In addition, upon information and belief, Dr. Jared Cotton, in his official capacity as current Superintendent of CPS, made assurances to the VDOE, between January of 2020 and July of 2020 that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

337.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Cotton used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Cotton used the interstate wires in the years 2019 and 2020, and is continuing to use them, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by CPS during its

closure.

<u>Defendant Dr. Scott A. Ziegler for Loudoun County Public Schools ("LCPS")</u>

338.   Upon information and belief, Dr. Scott A. Ziegler, in his official capacity as current Superintendent of LCPS, assured the VDOE, between January of 2019 and July of 2019, that LCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *Id*.

339.   In addition, upon information and belief, Dr. Scott A. Ziegler, in his official capacity as current Superintendent of LCPS, assured the VDOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *Id*.

340.   In addition, upon information and belief, Dr. Scott A. Ziegler, in his official capacity as current Superintendent of LCPS, made assurances to the VDOE, between January of 2020 and July of 2020, that LCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act." *See id*.

341.   In addition, upon information and belief, Dr. Scott A. Ziegler, in his official capacity as current Superintendent of LCPS, made assurances to the VDOE, between January of 2020 and July of 2020 that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

342.   In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Ziegler used interstate wires to defraud plaintiffs of their rights

under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Ziegler used the interstate wires in the years 2019 and 2020, and is continuing to use them, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by LCPS during its closure.

<u>Defendant Dr. Aaron C. Spence for the VBCPS</u>

343.    Upon information and belief, Defendant Dr. Aaron C. Spence, in his official capacity as Superintendent of VBCPS, made assurance to the VDOE, between January of 2019 and July of 2019, that ACPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit 16.

344.    In addition, upon information and belief, Defendant Dr. Aaron C. Spence, in his official capacity as Superintendent of VBCPS, made assurances to the VDOE, between January of 2019 and July of 2019, that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121."  *Id*.

345.    In addition, upon information and belief, Dr. Aaron C. Spence, in his official capacity as current Superintendent of VBCPS, made assurances to the VDOE, between January of 2020 and July of 2020, that VBCPS had "policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act."  Exhibit 16.

346.    In addition, upon information and belief, Dr. Aaron C. Spence, in his official capacity as current Superintendent of VBCPS, made assurances to the VDOE, between January of

2020 and July of 2020 that: "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§ 300.400 through 300.536 and in accordance with 20 U.S.C. § 1412(a)(6); 34 CFR§ 300.121." *See id*.

347.    In furtherance of his scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Spence used interstate wires to defraud plaintiffs of their rights under IDEA.  The interstate wires consisted of electronic messages and the collection of federal funds through the interstate banking system, all in furtherance of the scheme to defraud, and in violation of 18 U.S.C. § 1343.  Defendant Spence used these interstate wires in 2019 and 2020, and is continuing to use them, to further his objective to obtain federal funds under the false pretense that plaintiffs' procedural and substantive rights under IDEA were protected by the VBCPS during the closure of VBCPS.

Pattern of Racketeering Activity

348.    The course of conduct engaged in by each individual RICO defendant constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

349.    The individual defendants' predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." *See id*.

350.    All predicate acts had the same purpose of defrauding plaintiffs of IDEA Funds.

351.    The continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period, from about March 2020 to the present.

352.    There is a threat of continued activity as each individual defendant has repeatedly engaged in the illegal and illicit activities.  Engaging in the pattern of racketeering as set forth

55

herein is the regular way the individual defendants conduct the affairs of their respective associated association in fact enterprise.  Because each enterprise has been in existence for many years, and the seeking of federal funding by these individual defendants on behalf of their associated association in fact enterprise will continue indefinitely, each individual defendant, through the operation of his or her associated association in fact enterprise, remain a threat to others and their racketeering activity meets the open-ended continuity test.

Injury

353.    As a direct and proximate result of the individual defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(a), plaintiffs have been and are continuing to be deprived of their rights under IDEA, as set forth more fully above.

354.    As a direct and proximate result thereof, plaintiffs suffered harm including significant regressions in skills and loss of competencies.


COUNT TEN
VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
ACT ("RICO"), 18 U.S.C. §1962(d)
(Federal Civil RICO Conspiracy against Individual Defendants)

355.    Plaintiffs repeat each of the allegations contained in the paragraphs above as if set forth herein at length.

356.    In March 2020, each RICO defendant described above, conspired to violate § 1962(c), by agreeing that a co-conspirator would conduct or participate in the affairs of his or her respective enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. § 1341, and 18 U.S.C. § 1343, as more fully described in Count Eight.

357.    The conspiratorial objective of that mutual agreement was intended to fraudulently obtain and use plaintiffs' IDEA Part B funds, and such conspiratorial conduct violates §1962(d).

358.   Each RICO conspiracy defendant intended to further the schemes to defraud, as described in Count Seven, and agreed that either they, or a co-conspirator, would commit a pattern of racketeering.

359.   The individual defendants engaged in numerous predicate racketeering acts in furtherance of the conspiracy including systemic fraudulent assurances designed to defraud plaintiffs of their procedural and substantive rights under IDEA.

360.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each individual defendant not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but was aware that his or her ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully request that the Court:

1.   Assert jurisdiction over this matter;

2.   Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

3.   Issue a declaratory judgment that the class members' status quo, pendency placement is in-person instruction and services;

4.   Issue a declaratory judgment that ACPS, CCPS, CPS, APS, LCPS, VBCPS, and other similarly situated LEAs' unilateral change of placement of Plaintiffs from in-person instruction and services to virtual instruction and services for more than ten cumulative days in the 2019-2020 and 2020-2021 school years, respectively, violated the procedural

safeguards of IDEA and discriminated against plaintiffs under IDEA, the Virginia Regulations, § 504, the ADA, the Virginia Act, the VDA, and § 1983;

5. Issue a declaratory judgment that the VDOE failed to monitor and provide proper oversite and resources to ACPS, CCPS, CPS, LCPS, VBCPS, and APS, and other similarly situated LEAs during the COVID-19 pandemic as required under IDEA and the Virginia Regulations;

6. Order the VDOE, ACPS, CCPS, CPS, LCPS, VBCPS, and APS, and other similarly situated SEAs and LEAs to comply with the procedural safeguards guaranteed by IDEA for the 2021-2022 school year for the class members, thereby enjoining Defendants and other similarly situated State and LEAs from unilaterally changing the Plaintiffs' educational placement for more than ten cumulative days in the 2021-2022 school year in the event of any future school closures, and in subsequent school years, unless the U.S. DOE issues IDEA waivers;

7. Assign a Special Monitor to:   a) oversee the completion of Independent Education Evaluations ("IEE") for all the class members to determine regressions and loss of competencies due to the unilateral changes to their IEPs and placements, and reconvene IEP Team meetings within thirty days of the completion of the IEEs;  b) make expert recommendations to the Court regarding compensatory education or pendency payments for the class members to address any regressions and/or loss of competencies; and c) ensure the expert recommendations are included in writing in the class members' IEP documents;

8. Require the VDOE and its LEAs to comply with IDEA, the Virginia Regulations, the ADA, § 504, the Virginia Act, the VDA, and § 1983 in the event of any future school closures for which the U.S. DOE does not issue IDEA waivers;

9. Assign a RICO Special Monitor to:  a) oversee the completion of an independent audit of defendants' expenditures of their IDEA Part B Funds from March of 2020 to the present; b) oversee the defendants' expenditures of their IDEA Part B Funds for the 2021-2022 school year to ensure defendants spend IDEA Part B Funds for instruction and/or services for students with disabilities under IDEA;  and c) ensure any IDEA Part B Funds that defendants spent on items other than instruction and/or services for students with disabilities under IDEA from March of 2020 through the present are reimbursed to a monitored account to be spent only upon review and approval by the RICO Special Monitor;

10. Grant Plaintiffs, all class members, an award of compensatory education as appropriate, grant plaintiffs, all class members, an award of compensatory education in the form of an additional year of education, or more, for each school year, and/or portion thereof, plaintiffs received remote or hybrid education; grant plaintiffs, all class members, an award of compensatory education, as pendency, in the form of a dependency voucher, or pendency fund, to address and/or compensate plaintiffs', class members', regressions and/or loss of competencies;

11. Declare Plaintiffs to be the "substantially prevailing party" (for purposes of IDEA's fee shifting provision);

12. Grant leave to plaintiffs to submit a statutory fee application;

13. Award Plaintiffs, all class members, nominal damages;

14. Direct defendants to pay for the costs and expenses for maintaining this action, including reasonable attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B);

15. Allow Plaintiffs to seek punitive damages for the claims herein, except for the RICO-

related claims, to the extent that such damages are not barred by federal and state law;

16. Award attorneys' fees pursuant to the Rehabilitation Act, the Americans with Disabilities
    Act, and 42 U.S.C. § 1988;

17. Retain jurisdiction over this action until such time as this Court is satisfied that the systemic
    violations of the laws and regulations complained of herein have been rectified; and

18. Grant such other or further relief that the Court may deem just and proper.

Respectfully submitted,

**/s/ Caleb P. Dyer**
**Caleb P. Dyer**
Virginia State Bar No. 96091
Attorney for Plaintiffs
Brain Injury Rights Group
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
caleb@pabilaw.org

**EXHIBITS**

| 1 | A.B, IEP |
|---|---|
| 2 | T.A. IEP |
| 3 | W.T. IEP |
| 4 | A.D. IEP |
| 5 | J.T. IEP – Virginia Beach County Public Schools |
| 6 | J.T. IEP – Amherst County Public Schools |
| 7 | 3/12/20 Supplemental Fact Sheet by the United States Department of Education |
| 8 | March 2020 Questions and Answers of Providing Services to Children with Disabilities during the Coronavirus Disease 2019 Outbreak |
| 9 | EO 51 |
| 10 | EO 61 |
| 11 | Phased Reopening Document |
| 12 | July 26, 2019 Superintendent's Memo # 177-19 |
| 13 | July 1, 2020 Letter from U.S. DOE to Superintendent James Lane |
| 14 | July 17, 2020 Superintendent's Memo # 182-20 |
| 15 | July 23, 2021 Superintendent's Memo # 198-21 |
| 16 | Part B Application for FFY 2020-2021 |

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, Jennifer Bills, Karen Altobello, John Tignor, Diana Duplantier and Joleen

Booth, individually and on behalf of their special needs children (collectively referred to as

"Plaintiffs") hereby demand a trial by jury.


Respectfully submitted,

**/s/ Caleb P. Dyer**
**Caleb P. Dyer**
Virginia State Bar No. 96091
Attorney for Plaintiffs
Brain Injury Rights Group
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
caleb@pabilaw.org